UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASHANTI FRANKLIN, on behalf of herself and on behalf of JOHN DOE, a minor, ROMELL FRANKLIN, and ARIANA FRANKLIN, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) Case No. 1:18-cv-06281 |
| v. | )<br>) Hon. Steven C. Seeger |
| CITY OF CHICAGO, a municipal corporation; Sergeant JOHN GRAHAM (Star #1071), in his individual and official capacity; Officer JASON ACEVEDO (Star #11683), in his individual and official capacity; Officer JASON EDWARDS (Star #19173), in his individual and official capacity; Officer KEVIN HAWKINS (Star #13471), in his individual and official capacity; Officer WILLIAM HRONOPOULOS (Star #39785), in his individual and official capacity; and BEN MILLIGAN, in his individual and official capacity, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Defendant City of Chicago moves to dismiss certain counts and to strike certain allegations from the Second Amended Complaint. *See* Defendant City of Chicago's Motion to Dismiss Counts X–XII and Motion to Strike ("Motion") (Dckt. No. 30). The Court grants in part and denies in part the motion. Plaintiffs do not oppose dismissing Counts X–XII against the City, so that portion of the motion is granted. The motion to strike allegations from the Second Amended Complaint is denied.

## Background

Ashanti Franklin, her husband, and her two children complain about a mistaken raid on their home by the Chicago Police Department. According to Plaintiffs, "several White males" in hooded sweatshirts and jackets banged on their front door at six o'clock on a Thursday morning in March 2017. *See* Second Amended Complaint ("Second Am. Cplt."), at ¶¶ 23–25 (Dckt. No. 10-1). At that hour, the family was "all asleep at their apartment unit on the 2nd level of a three-level building on Chicago's West Side." *Id.* at ¶ 23. The pounding woke up the family, and it proved to be a rude awakening. *Id.* at ¶ 25.

Mrs. Franklin looked out at the men through a front window. *Id.* Not recognizing any of them, she told them (through the window) that they had the wrong house. *Id.* The men told her they were there to get "Gregory Hines," had a warrant, and if she didn't open the door they would "bust it down." *Id.* at ¶ 26. She asked to see the warrant (still, through the window). *Id.* at ¶ 27. "If you don't open the door in two seconds, I'm going to kick the door in," said one of the officers. *Id.* When no one opened the door, the officers broke it down. *Id.* at ¶ 29.

Four officers entered the family's apartment with guns drawn, including an assault rifle. *Id.* at ¶ 30. One officer held Mrs. and Mr. Franklin and their daughter at gunpoint near the front door. *Id.* at ¶ 31. The other three officers searched the apartment, presumably looking for Gregory Hines. *Id.* The family's twelve-year-old son was still in his bedroom. *Id.* at ¶ 32. As he opened and exited his bedroom door, one or more officers trained their guns on the child. *Id.*

Mr. Franklin asked to see the officers' warrant, and also asked for their names and badge numbers. *Id.* at ¶ 33. The officers refused: "You see six White dudes outside your door, you should've known to open the door." *Id.*

The officers eventually realized Mrs. Franklin was right – they had the wrong house. The officers then left, leaving a broken door and a shaken-up family. *Id.* at ¶¶ 34–36. Since the events of that morning, Plaintiffs allege that Chicago police officers have repeatedly harassed the family, including "making disrespectful remarks to Mr. Franklin." *Id.* at ¶ 37.

Plaintiffs allege a § 1983 *Monell* claim against Defendant City of Chicago (Count IX), arguing that an official City policy caused the alleged constitutional violations. *Id.* at ¶¶ 113–19 (Dckt. No. 10-1); *see also Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978). Plaintiffs also allege several other § 1983 claims against the City of Chicago, including Excessive Force (Count X), Conspiracy (Count XI), and Failure to Intervene (Count XII). *See* Second Am. Cplt., at ¶¶ 120–34.

## Analysis

The City of Chicago now seeks to narrow this case by trimming some of the claims and pruning some of the allegations. The City asks this Court to dismiss three counts and strike some of the language in the Second Amended Complaint.

**I.     Motion to Dismiss**

First, the City moves to dismiss Counts X–XII of the Second Amended Complaint. *See* Motion, at 1–3, 5–6 (Dckt. No. 30). Plaintiffs do not oppose dismissing those counts against the City. *See* Plaintiffs' Response to Defendant City of Chicago's Motion to Dismiss and Motion to Strike, at 2 (Dckt. No. 55). The Court thus grants the motion to dismiss. Counts X–XII against the City of Chicago are hereby dismissed.

Even so, the City of Chicago will remain a defendant. Plaintiffs allege many state law claims against the City, which the City has not moved to dismiss. *See* Second Am. Cplt., at

¶¶ 75–112 (Dckt. No. 10-1) (Counts I–VIII); *see also* Motion (Dckt. No. 30). The City has also not moved to dismiss Plaintiffs' *Monell* claim (Count IX). *See* Motion, at 6 (Dckt. No. 30).

## II.    Motion to Strike

Second, the City also moves to strike several allegations in the Second Amended Complaint, meaning factual allegations in the body of the pleading. *See* Motion (Dckt. No. 30). The City objects to four types of statements: (1) allegations concerning Latinos, given that Plaintiffs are Black; (2) "racially charged" allegations; (3) allegations about studies, media reports, and events with no direct connection to the events experienced by the Franklin family; and (4) allegations about how the City's collective bargaining agreement with police officers affects the City's handling of citizen complaints. *See* Motion, at 6–14 (Dckt. No. 30). For the reasons explained below, the motion to strike is denied.

Under Rule 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The operative helping verb – "may" – confirms that striking allegations from a pleading is discretionary, not mandatory. *Id.* Striking a portion of a pleading is a drastic remedy, narrowing the case without the benefit of an evidentiary record. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (3d ed. 2019).

Usually, there are better ways to trim fat from a case. *See Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 1006–07 (N.D. Ill. 2013) (denying motion to strike because, "[a]t the appropriate time, [the movant] can move to bar evidence that is unfairly prejudicial or otherwise excludable"). During discovery, a party may move for a protective order if the other party seeks discovery that is not relevant and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1), (c)(1). At summary judgment, a party may object to the consideration of

inadmissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).  After summary judgment, a party may seek to exclude extraneous evidence from the trial, both by pretrial motion and by objecting during the proceeding.  *See*, *e.g.*, Fed. R. Evid. 401–03.  Each step of the way, courts have the benefit of a fuller, richer factual record.

Motions to strike are disfavored and rarely granted.  *See Newkirk v. Village of Steger*, 2004 WL 2191589, at *24 (N.D. Ill. 2004); 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (3d ed. 2019).  The Court should not strike language from pleadings unless it has no possible relation to the controversy and is clearly prejudicial.  *See Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 1007 (N.D. Ill. 2013); *see also Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 664 (7th Cir. 1992) ("[a]llegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting party prejudice"); *Manuel v. Lucenti*, 2004 WL 2608355, at *2 (N.D. Ill. 2004) ("to strike portions of a complaint, the allegations being challenged must be so unrelated to plaintiff's claims as to be void of merit and unworthy of any consideration and must be prejudicial to the movant") (cleaned up).

If a motion to strike clears that high bar, the Court may strike language from pleadings if it will "expedite" the proceedings by "remov[ing] unnecessary clutter from the case."  *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).  The Court has "considerable discretion" in deciding whether to strike language in pleadings.  *Delta Consulting Group, Inc. v. R. Randle Construction, Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

The only issue now is whether the language can remain in the pleadings at this early stage.  At trial, with the benefit of a fuller record, things may change.  The Court does not make any decisions about whether the evidence would be relevant or otherwise admissible at trial.

A.  Allegations About Latino Citizens

The City moves to strike references to "Latino citizens" and "Latino communities" from paragraphs 6–8, 55, 63, 67, 68, and 70–71 of the Second Amended Complaint. *See* Motion, at 6–7 (Dckt. No. 30). For example, Plaintiffs allege in paragraph 6 that "[t]he CPD has failed to provide meaningful training, supervision, post-incident review, and/or or [sic] discipline for officers who have unlawfully entered the home [sic] of its citizens, particularly its Black *and Latino* citizens." Second Am. Cplt., at ¶ 6 (Dckt. No. 10-1) (emphasis added). As the City of Chicago points out, Plaintiffs allege that they are "Black residents of Chicago, Illinois," but do not allege that they are Latino. Second Am. Cplt., at ¶ 3 (Dckt. No. 10-1); *see also* Motion, at 7 (Dckt. No. 30). The City of Chicago argues that "allegations concerning Latinos are immaterial and unnecessary to Plaintiffs' claims, and 'serve[] no purpose other than scandalizing defendants' conduct.'" Motion, at 7 (Dckt. No. 30) (quoting *Board of Education of Thornton Township High School District 205 v. Board of Education of Argo Community High School District 217*, 2006 WL 1896068, at *3 (N.D. Ill. 2006)).

The Court declines to strike those allegations because it is not clear, at this preliminary stage, that they have no possible relation to the controversy. The Court understands the Second Amended Complaint to allege that the City has an official policy of police discrimination against people of color, *i.e.*, including both Blacks and Latinos. Plaintiffs basically allege that the Chicago Police Department discriminates against minority communities. That issue might be a disputed question of fact for the parties to explore during discovery. And it may or may not prove to be admissible at trial. But at this point, the Court will not rule out the possibility that such evidence might have a bearing at trial. In the meantime, the allegation is not so "scandalous" that it cannot be spoken. *See* Fed. R. Civ. P. 12(f).

B.     **"Racially Charged" Allegations**

The City also moves to strike paragraphs 8, 38–39, 43, and 73 in their entirety because they "concern[] the City's treatment of Black citizens" and "are extremely inflammatory and racially charged." Motion, at 7–9 (Dckt. No. 30). For example, paragraph 39 alleges: "The City of Chicago's police force has gained worldwide notoriety for extreme disrespect and brutality against Black residents in Chicago." Second Am. Cplt., at ¶ 39 (Dckt. No. 10-1). Paragraph 43 alleges: "Chicago police officers can feel comfortable inflicting excessive brutality and constitutional violations against Black citizens, without fear of retribution." *Id.* at ¶ 43. Aside from being inflammatory, the City argues that those allegations are "conclusory and redundant" because the Second Amended Complaint includes "several [other] paragraphs concerning essentially the same allegations, with some paragraphs including more description, rather than just conclusions." Motion, at 8–9 (Dckt. No. 30).

The allegation about "worldwide notoriety" was a bit much. *See* Second Am. Cplt., at ¶ 39. It makes no difference what people think of the Chicago Police Department on the other side of the globe. Still, viewed as a whole, the Court declines to excise those paragraphs, particularly at this early stage. It is no surprise that a race discrimination case includes "racially charged" allegations. *See* Second Am. Cplt., at ¶ 38 ("the defendant officers' unlawful conduct was directly caused by City of Chicago's embrace of a *racist* custom, policy and/or practice") (emphasis added); *id.* at ¶ 73 ("[t]he plaintiffs were injured because defendant police officers knew that they could violate the [c]onstitutional rights of *Black* citizens, and . . . no one of any authority would question their conduct . . . and/or they would face no consequences") (emphasis added). The Federal Rules do not allow the gratuitous insertion of "scandalous" material. *See*

Fed. R. Civ. P. 12(f). But they do not require Plaintiffs to handle their allegations with kid gloves, either.

Viewed as a whole, the complaint alleges that members of the Chicago Police Department crashed through a front door and broke into a home before waking hours. The police woke up an innocent family. With guns drawn. After pointing deadly weapons at a family in pajamas, the police eventually left. Plaintiffs essentially allege that this conduct is consistent with other misconduct targeting minority communities. And they allege that members of the Chicago Police Department act that way because there is no downside.

The City complains about the use of the words "brutality" and "brutalize." *See* Second Am. Cplt., at ¶¶ 8, 39, 43, 49. But all in all, those words are not inherently beyond the pale, especially on these facts. The officers crashed through the door using brute force, and then pointed deadly weapons at a still-groggy innocent family. In the context of an excessive force case alleging racial discrimination, those words are not so needlessly cruel or repulsive that they cannot be uttered. *See Khalid Bin Talaj v. E.F. Hutton & Co.*, 720 F. Supp. 671, 686 (N.D. Ill. 1989) ("to ascertain the parameters of 'scandalous,' we question whether the allegations reflect cruelly upon the defendant's moral character, use repulsive language or detract from the dignity of the court") (cleaned up).

In its motion, the City cites a case where another court in this District struck references to "apartheid," "white flight," and "racial Mason-Dixon line" as impertinent in a complaint alleging racial segregation in suburban Chicago. *See Board of Education of Thornton Township High School District 205 v. Board of Education of Argo Community High School District 217*, 2006 WL 1896068, at *2 (N.D. Ill. 2006); *see also* Motion, at 6–7 (Dckt. No. 30). Those allegations were deemed to be inflammatory and over the top. But the allegations in this case are

distinguishable. Plaintiffs' allegations are not the same kind of hyperbolic analogies that the district court found objectionable in the *Thornton Township* case.

The Court will not strike language from pleadings simply because a defendant finds it offensive. The "allegations [the City] wishes to purge unquestionably place it in unflattering light, but not in an *ad hominem* or irrelevant way. That is, it is the nature of the misconduct that [P]laintiffs allege that is offensive." *Volling v. Antioch Rescue Squad*, 999 F. Supp. 2d 991, 1006 (N.D. Ill. 2013).

Indeed, the intensity conveyed by Plaintiffs' language is actually a feature, not a bug, buttressing their *Monell* claim that the officers' actions were the product of an official policy. A notorious reputation for racial brutality would suggest that City leaders were at least aware of the problem and did nothing (or did not do enough). *See* Second Am. Cplt., at ¶ 39 (Dckt. No. 10-1). If officers felt comfortable brutalizing African Americans in Chicago, that may make it more probable that they were emboldened by a racially discriminatory official policy. *See id.* at ¶ 43; *see also* Fed. R. Evid. 401(a) ("[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable"). At the very least, that argument can live to fight another day.

At the pleading stage, the Court cannot say whether evidence will bear out those allegations. But in the meantime, there is little downside in requiring the City to answer the allegations, particularly if – as the City argues – they are somewhat redundant of other allegations in the Second Amended Complaint. *See* Motion, at 8–9 (Dckt. No. 30); *see also In re Asbestos Cases*, 1990 WL 36790, at *4 (N.D. Ill. 1990) ("mere redundancy is insufficient to form the basis for a motion to strike if the substance of the pleading is not undermined") (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (1969)). The City must answer paragraphs 8, 38–39, 43, and 73 of the Second Amended Complaint.

## C. Allegations About Studies, Media Reports, and Other Events

The City also moves to strike paragraphs 40–42 and 48–50 because they refer to studies, media reports, and events "occurring decades ago, involving different claims and officers and outdated polices." *See* Motion, at 12 (Dckt. No. 30). The City contends that they are "irrelevant to CPD's current patterns and practices of policing." *Id.* For example, paragraph 40 describes findings published in a psychology journal in March 2014 from a study of police officers (not necessarily Chicago police officers) that "found that officers commonly dehumanized Black people." Second Am. Cplt., at ¶ 40 (Dckt. No. 10-1). Paragraph 41 describes a photo published by the Chicago Sun Times showing "two White police officers posing with a Black man in custody." *Id.* at ¶ 41. "While the two White CPD officers held rifles, the young Black man was forced to wear deer antlers, as if he were an animal." *Id.* Paragraph 42 describes statistics from a recent ACLU report showing how often Chicago police officers stopped African Americans compared with Whites. *Id.* at ¶ 42. Paragraph 48 alleges that the City protected Chicago police officer "John Burge, [who] led a torture ring of Chicago police detectives against Black male Chicago residents." *Id.* at ¶ 48. Paragraphs 49–50 both appear to refer to a University of Chicago report issued in 2007 about complaints against Chicago police officers. *See id.* at ¶¶ 49–50.

By arguing that those references are irrelevant, the Court understands the City to argue that they are either "immaterial" or "impertinent" under Rule 12(f). *See* 2 James Wm. Moore *et al.*, *Moore's Federal Practice* § 12.37[3] (3d ed. 2019) ("An allegation is 'impertinent' or 'immaterial' when it is neither responsive nor relevant to the issues involved in the action."). They are not. Or at least, the Court cannot say at the pleading stage that studies on racial bias, statistics on the City's handling of police complaints, and historical events that allegedly show

10

racial bias within the Chicago Police Department are necessarily immaterial or impertinent to Plaintiffs' claim that the City had a racially discriminatory policy. Those allegations do not merely belabor "minutiae of similar lawsuits against" the City, as argued in the City's motion. Motion, at 12 (Dckt. No. 30) (quoting *Brown v. ABM Industries, Inc.*, 2015 WL 7731946, at *6 (N.D. Ill. 2015)). Instead, they "add context to Plaintiff[s'] claims" by alleging facts that, if true, might contribute to Plaintiffs' case. *Brown*, 2015 WL 7731946, at *6.

All of the paragraphs refer to publicly available information – published studies and events widely reported in the news. Almost without exception, the paragraphs merely allege that a study or article exists, and briefly summarize the findings or news. So the cat is already out of the bag. There is nothing especially scandalous about repeating material in the public domain.

The Court also finds that nothing is lost by requiring the City to respond. The Court doubts that it will take "enormous factual investigation to respond." Motion, at 12 (Dckt. No. 30). Admitting or denying the allegations will not be difficult. The City undoubtedly has a well-honed strategy for responding to allegations of this sort in other cases.

### D. Allegations About the Collective Bargaining Agreement and Citizen Complaints

Finally, the City moves to strike paragraphs 64–66, which allege that the City's collective bargaining agreement with the Fraternal Order of Police deters citizen complaints and limits investigations into misconduct. *See* Motion, at 12–13 (Dckt. No. 30). Paragraph 64 alleges: "The [collective bargaining] agreements mandate disclosure of a complainant's identity to an accused officer before questioning, which is problematic because many complainants fear police retaliation." Second Am. Cplt., at ¶ 64 (Dckt. No. 10-1). Paragraph 65 alleges that "[p]eople issuing complaints . . . must sign sworn affidavits under threat of perjury, which intimidate [sic] victims of misconduct from reporting." *Id.* at ¶ 65. Paragraph 66 alleges that "[t]he agreements

11

limit investigations into misconduct complaints filed more than five years after an incident, and requires [sic] the destruction of most disciplinary records older than five years." *Id.* at ¶ 66.

The City argues that those allegations are immaterial or impertinent because "[t]here is no claim that Plaintiffs in this case were dissuaded from filing a complaint against the involved officers for fear of retaliation." Motion, at 13 (Dckt. No. 30). The City asserts that "Plaintiffs also cannot make the correlation that the fear or failure of a citizen to file a complaint of misconduct has promoted the alleged code of silence between fellow officers." *Id.*

The City's arguments miss the point. The question is whether a City policy on citizen complaints emboldened the officers to discriminate against Plaintiffs when they arrived at their doorstep. The City might have emboldened the officers by maintaining an official policy to discourage citizens from filing complaints, and to never investigate those complaints that are filed. On the other hand, a City policy to encourage and thoroughly investigate citizen complaints might have deterred the officers from discriminating, and eroded and ultimately broken any code of silence between officers. The City notably fails to address any of those points in its motion, or in its reply (Dckt. No. 59). *See* Motion, at 12–13 (Dckt. No. 30); Reply, at 5 (Dckt. No. 59).

Of course, the Court makes no finding on whether Plaintiffs' allegations are true, or what policies the City actually maintains. Only discovery will tell. The only issue now is whether the language is so far out of bounds that it deserves banishment from the case. The Court declines to prematurely narrow the case at the pleading stage without first seeing the evidence. The Court will not strike paragraphs 64–66 from the Second Amended Complaint.

## Conclusion

The Court grants in part and denies in part Defendant City of Chicago's Motion to Dismiss and to Strike. The Court dismisses Counts X–XII against the City, but denies the motion to strike. The City must supplement its previously filed answer (Dckt. No. 32) and respond to all allegations in the Second Amended Complaint by February 7, 2020.

Date: January 23, 2020

Steven C. Seeger
United States District Judge